**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CATALYST PHARMACEUTICALS, INC. and SERB SA,<br><br>Plaintiffs,<br><br>v.<br><br>JACOBUS PHARMACEUTICALS COMPANY, INC.,<br><br>Defendant. | Civil Action No. 20-14590 (MAS) (DEA)<br><br>**MEMORANDUM OPINION**<br>**FILED UNDER TEMPORARY SEAL** |
| CATALYST PHARMACEUTICALS, INC. and SERB SA,<br><br>Plaintiffs,<br><br>v.<br><br>PANTHERX SPECIALTY LLC and PANTHER SPECIALTY HOLDING CO.,<br><br>Defendants. | Civil Action No. 20-17040 (MAS) (DEA) |

**SHIPP, District Judge**

This matter comes before the Court on Plaintiffs Catalyst Pharmaceuticals, Inc. ("Catalyst") and SERB SA's ("SERB," and collectively with Catalyst, "Plaintiffs") Motions to: (1) Dismiss Defendant Jacobus Pharmaceutical Company, Inc.'s ("Jacobus") inequitable conduct counterclaims, and (2) Strike Jacobus's inequitable conduct defenses. (ECF No. 87.) Jacobus, joined by Pantherx Specialty LLC, and Panther Specialty Holding, Co. (collectively, "Pantherx")

opposed (ECF No. 94), and Plaintiffs replied (ECF No. 95). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants Plaintiffs' Motion to Dismiss without prejudice and grants Plaintiffs' Motion to Strike.

I. **BACKGROUND**[1]

The dispute centers around two patents, U.S. Patent 10,793,893 ("the '893 patent") and U.S. Patent 11,060,128 ("the '128 patent") (collectively, "patents-in-suit"). (Am. Compl. ¶¶ 21-25, ECF No. 70.) Boiled down, the patents-in-suit are methodologies to administering necessary drugs to individuals with extreme neuromuscular disorders.

A. **The Patents-in-Suit**

The patents-in-suit concern methods of administering the drug 3,4-diaminopyridine, also known as amifampridine, to treat amifampridine-sensitive diseases. (*Id.*) One such disease is Lambert-Eaton myasthenic syndrome ("LEMS"). (*Id.*) LEMS is a rare and debilitating neuromuscular disorder involving impairment of neuromuscular transmission and serious muscle weakness. (*Id.* ¶¶ 15-17.) Amifampridine is a nonspecific voltage-dependent potassium channel blocker that can improve neuromuscular transmission and ameliorate muscle fatigue and other LEMS symptoms. (*Id.*) The historical problem with amifampridine was that one dose of the drug could cause drastically different results in different patients depending on the patients' variation of a specific gene, N-acetyltransferase ("NAT2"). (*Id.*)

---

[1] The parties are familiar with the factual background of this matter, which has been explored by the Court previously. *See Catalyst Pharm., Inc. v. Jacobus Pharm. Co., Inc.*, No. 20-14590, 2021 WL 3293430, at *1-2 (D.N.J. July 31, 2021). The Court, therefore, recites only the facts necessary to resolve the instant Motion.

In an attempt at a solution, the '893 patent recites a method of administering amifampridine in a particular dose range (between 2.5 mg to 30 mg) to patients with the NAT2 mutation. (*Id.* ¶¶ 21-22.) Similarly, the '128 patent recites a method of treating LEMS by administering a particular daily dose range (between 7.5 mg and 40 mg) of amifampridine to individuals with the NAT2 mutation.[2] (*Id.* ¶¶ 23-25.) Both patents belong to the same patent family. (*See generally id.* at Ex. 1, 4, ECF No. 70-1.) How are the patents-in-suit different then? The difference primarily lies in the claimed total daily dose ranges of the administered drug. To be clear, the novelty in Plaintiffs' invention is its improved method of treating LEMS with amifampridine in patients with NAT2 mutations.[3] (*Id.* ¶¶ 19-20.)

**B.    The Timeline of Patents-in-Suit**

To resolve the instant dispute, the interrelated timeline of the patent prosecution and the parallel litigation of the patents-in-suit warrants brief recitation. Plaintiffs filed the '893 patent at the United States Patent and Trademark Office ("Patent Office") on May 7, 2014.[4] (*Id.* at Ex. 1.) At that time, BioMarin owned the interest in the '893 patent. While prosecution was pending before the Patent Office, Plaintiffs received FDA approval of a New Drug Application ("NDA")

---

[2] Claim 1 of the '128 patent, relevant here, recites as follows: "A method of treating a human patient diagnosed with Lambert-Eaton myasthenic syndrome (LEMS) in need of treatment thereof comprising administering a total daily dose of about 7.5 mg to about 40 mg of 3,4-diaminopyridine (3,4-DAP), or an equivalent amount of a pharmaceutically acceptable salt thereof, to a human patient who is a N-acetyl transferase 2 (NAT2) slow acetylator, wherein the total daily dose is optionally provided as a series of divided doses." (Am. Compl. ¶ 24.)

[3] This is evidenced by the inventors' alleged discovery of the interaction between NAT2 and amifampridine and that NAT2 slow acetylator individuals having particular mutations (listed in representative claim 1 of the '893 patent) metabolize amifampridine more slowly compared to those without the mutations. (Am. Compl. ¶¶ 19-20.)

[4] The patents-in-suit claim priority to a National Stage Entry of PCT/US2012/044904 application and two provisional applications 61/553,045 ('045) and 61/503,553 ('553) with an earliest priority date of June 30, 2011. (*See* Am. Compl., Ex. 1, 4, ECF No. 70-1.)

for the use of amifampridine tablets in November 2018. (*Id.* ¶ 18.) Plaintiffs subsequently started selling the tablets under the trade name Firdapse®. (*Id.*) Naturally, there were competitors in the market. One of them, Jacobus, made amifampridine available for LEMS patients through a compassionate use program permitted by the FDA. (Countercl. Compl. ¶ 10, ECF No. 73.) It also attempted to seek FDA approval for its amifampridine product between 2010 and 2017 and finally got it approved under the trade name Ruzurgi® in May 2019. (Am. Compl. ¶¶ 26-36.) On Plaintiffs' end, they had a change in ownership interest in the '893 patent conveyed from BioMarin to SERB at the Patent Office in April 2020. SERB currently owns the patents-in-suit and Catalyst is the exclusive licensee. (*Id.* ¶¶ 3-5.) The Patent Office issued a notice of allowance as to the '893 patent on October 6, 2020 (*id.* ¶ 21), and within days Plaintiffs sued Jacobus for infringement of the '893 patent (*see generally id.*).

About a month before litigation ensued in this Court, Plaintiffs also filed the '128 patent at the Patent Office. (*Id.* at Ex. 4.) The Patent Office issued a notice of allowance as to the '128 patent on July 13, 2021. (*Id.*) About fifteen days after the issuance of the '128 patent, this Court denied Jacobus's Motion to Dismiss Plaintiffs' Complaint as to the '893 patent. (ECF No. 66.) Within a month, Plaintiffs filed an Amended Complaint, this time alleging infringement as to both patents-in-suit. Jacobus answered and filed its own counterclaims.[5] (*See generally* Countercl. Compl.) Among other counterclaims, Jacobus seeks declaratory judgments against the patents-in-suit for unenforceability under the doctrine of inequitable conduct. (*Id.* at 37.)

The gist of Jacobus's argument is that Catalyst, SERB, and BioMarin violated their duty of disclosure, candor, and good faith with respect to the patents-in-suit. (*Id.* ¶ 59.) Jacobus claims

---

[5] While Pantherx joined Jacobus as co-defendant in opposition to Plaintiffs' Motion to Dismiss, the inequitable conduct counterclaim referred to here was raised only by Jacobus. Thus, while the Court acknowledges Panthrex to be a co-defendant, the Court focuses its analysis on Jacobus.

that the inventors of the patents-in-suit, Plaintiffs' patent prosecution attorneys, and "other individuals employed at or working on behalf of Catalyst, SERB, or BioMarin" engaged in inequitable conduct by acting with intent to deceive the Patent Office by failing to disclose or knowingly misrepresenting material information. (*Id.* ¶ 58.) What information does Jacobus allege was withheld? Well, Jacobus poses several theories in support of its allegation. *First*, Jacobus alleges that Plaintiffs knowingly withheld material prior art from the Examiner during prosecution of the patents-in-suit. (*Id.* ¶ 61.) *Second*, Jacobus avers that Plaintiffs knowingly failed to disclose to the Patent Office highly material information that arose in the '893 litigation. (*Id.* ¶¶ 61, 157-60.) *Third*, Jacobus alleges that Plaintiffs knowingly withheld non-prior art information from the Examiner during the prosecution of the patents-in-suit that was material to patentability under 35 U.S.C. §§ 101 and 112. (*Id.* ¶¶ 69-76, 133-40.) In furtherance of that allegation, Jacobus asserts that the dose ranges claimed in the patents-in-suit had no meaningful connection to the safe and effective treatment of LEMS in patients with NAT2 mutations. (*Id.* ¶ 76.)

Before the Court is Plaintiffs' motion to dismiss Jacobus's inequitable conduct counterclaims with prejudice and to strike related affirmative defenses.

## II. LEGAL STANDARD

### A. Motion to Dismiss

Under the Federal Rules of Civil Procedure, a Complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).[6] A Complaint fails to state a claim under Rule 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Where a complaint

---

[6] Unless otherwise noted, all references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). When considering plausibility, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

In reviewing a Rule 12(b)(6) motion, the Court only considers the Complaint, documents incorporated by reference in the Complaint, and matters of judicial notice. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)). In evaluating a motion to dismiss, the movant bears the burden of showing that no claim has been presented. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *Miller v. United States*, 642 F. Supp. 2d 437, 441 (M.D. Pa. 2009).

### B.  Motion to Strike

Rule 12(f) provides in pertinent part that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The district court's decision whether to grant a motion to strike under Rule 12(f) is discretionary. *FTC v. Hope Now Modifications, LLC*, No. 09-1204, 2011 WL 883202, at *2 (D.N.J. Mar. 10, 2011) (citing *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)).

"[M]otions to strike 'serve a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent litigating issues which would not affect the outcome of the case.'" *United States v. Kramer*, 757 F. Supp. 397, 410 (D.N.J. 1991) (citation

omitted). However, the Third Circuit has instructed district courts to deny a motion to strike a defense "unless the insufficiency of the defense is 'clearly apparent.'" *Cipollone v. Liggett Grp, Inc.*, 789 F.2d 181, 188 (3d Cir. 1986) (quoting *May Dep. Stores Co. v. First Hartford Corp.*, 435 F. Supp. 849, 855 (D. Conn. 1977)). "[O]n the basis of the pleadings alone, 'an affirmative defense can be stricken only if the defense asserted could not possibly prevent recovery under any pleaded or inferable set of facts.'" *Hope Now Modifications*, 2011 WL 883202, at *2 (quoting *Tonka*, 836 F. Supp. at 218).

## III. DISCUSSION

Plaintiffs challenge Jacobus's counterclaims for inequitable conduct as well as its affirmative defenses for the same. The Court considers each in turn.

### A. Motion to Dismiss

Plaintiffs move to dismiss Jacobus's inequitable conduct counterclaims with prejudice. (*See generally* Pls.' Moving Br., ECF No. 88.) According to Plaintiffs, courts routinely dismiss inequitable conduct counterclaims raised at the pleadings stage where the accused infringer fails to plead the allegations with the requisite particularity, as required under Rule 9(b). (*Id.* at 1.) Plaintiffs argue that Jacobus has utterly failed to plead facts plausibly suggesting materiality or intent to sustain an inequitable conduct claim. (*Id.* at 2.) Specifically, Plaintiffs argue that (1) it is settled law that attorney argument about prior art references the Patent Office *actually considered* cannot give rise to a claim of inequitable conduct; (2) Jacobus blatantly mischaracterized Plaintiffs' infringement arguments; (3) Jacobus failed to allege materiality of the non-prior art references or specific intent to deceive the Patent Office; and (4) the documents Jacobus cited to (including the FDA-approved label for Ruzurgi®) in support of its meaningful connection argument stated the opposite proposition. (*Id.* at 1-2.)

Inequitable conduct is an equitable defense to patent infringement, essentially a claim that a patentee unfairly obtained an unwarranted patent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). The doctrine evolved from three Supreme Court opinions exclusively penalizing "deliberately planned and carefully executed" misconduct. *See id.* at 1285-87 (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) (overruled on other grounds); *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945)). With time, however, the doctrine adopted the reputation of being the "atomic bomb" of patent law as a finding of inequitable conduct in any one claim would render the entire patent (and its family) unenforceable. *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d 1334, 1349 (Fed. Cir. 2008) (Rader, J., dissenting).

With these far-reaching consequences, the doctrine naturally became one of the most common litigation tactics plaguing the entire patent system. *See Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir. 1984) ("[Inequitable conduct] has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system."). In light of this chaos, the Federal Circuit tightened the reins in *Therasense* by adopting a stricter standard to prove inequitable conduct. 649 F.3d at 1290. Hence, a party alleging inequitable conduct now must plead with particularity that the patentee, in applying for its patent, (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the Patent Office. *Id; Eagle View Techs., Inc. v. Xactware Sols., Inc.*, 325 F.R.D. 90, 93 (D.N.J. 2018).

Materiality and intent are distinct requirements, and a weak showing of one is insufficient to prove inequitable conduct based on a strong showing of the other. *Therasense*, 649 F.3d at 1290. The materiality required under the test is generally but-for materiality, and the deceptive intent can be inferred from indirect or circumstantial evidence provided that "the specific intent to deceive

8

must be the single most reasonable inference able to be drawn from the evidence." *Id.* at 1290 (quoting *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). These pleading requirements logically apply whether a defendant asserts inequitable conduct as a counterclaim or as an affirmative defense. *ESCO Corp. v. Cashman Equip. Co.*, 158 F. Supp. 3d 1051, 1059 (D. Nev. 2016).

To survive a motion to dismiss here, Jacobus bears the burden of pleading the "who, what, when, where, and how of the material misrepresentation or omission committed before the [Patent Office]." *Exergen v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1329 (Fed. Cir. 2009); *accord Waters Indus., Inc. v. JJI Int'l, Inc.*, No. 11-3791, 2012 WL 5966534, at *4 (N.D. Ill. Nov. 28, 2012) ("*Therasense* did not address inequitable conduct claims at the pleading stage[,] nor did it override *Exergen's* pleading requirements."). The Court concludes that Jacobus has failed to meet its burden and addresses its arguments in turn.[7]

### 1. Plaintiffs Did Not Withhold Material Prior Art with a Specific Intent to Deceive.

Jacobus refers to thirteen prior-art references that Plaintiffs allegedly failed to disclose to the Examiner during prosecution of the '893 patent, alleging that Plaintiffs subsequently did so during prosecution of the '128 patent in a bad faith attempt to deceive the Examiner. (Countercl. Compl. ¶¶ 62-75.) Plaintiffs counter that "(1) Jacobus has not plausibly alleged that the references were 'but for' material to patentability and (2) Jacobus has not plausibly alleged that any specific individual acted with intent to deceive the Patent Office." (Pls.' Moving Br. 14.) The Court agrees.

---

[7] The Court has also carefully considered Jacobus's other arguments about anticipation (*see* Countercl. Compl. 50), and the alleged inconsistency between Plaintiffs' infringement and patentability arguments (*id.* at 62) and rejects the same for failure to state a claim upon which relief can be granted.

Jacobus alleges that during prosecution of the '128 patent, Plaintiffs provided a "Third Supplemental Information Disclosure Statement" to the Patent Office in April 2021 that disclosed the already ensuing litigation of the '893 patent and citations to prior art references "with no explanation or context." (Countercl. Compl. ¶ 157.) However, the Examiner issued a second notice of allowance for the '128 patent application after the Examiner in fact reviewed that information. The Patent Office, thus, was on notice of and considered the prior art as it relates to the '128 patent. This supports the conclusion that the allegedly withheld prior art references were not but-for material to the patentability of these claims. It is also well-settled that a patentee need not state the "relevance of the references listed" in its disclosure to the Patent Office. *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) ("An applicant cannot be guilty of inequitable conduct if the reference was cited to the [E]xaminer, whether or not it was a ground of rejection by the [E]xaminer."). The Court, therefore, concludes that Jacobus's pleading fails to plausibly allege that "the [Patent Office] would not have allowed a claim had it been aware" of the withheld references. *Therasense*, 649 F.3d at 1291.[8]

Because the Court finds that Jacobus has not plausibly alleged that the withheld references are "but-for" material to patentability, it need not reach intent. Even if the Court were to weigh in on intent, Jacobus does not plausibly allege that Plaintiffs acted with specific intent to deceive the Patent Office. An inequitable conduct claim must allege that a specific individual "knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290. Here, at best, Jacobus speculates about the specific intent element. (*See e.g.*, Countercl. Compl.

---

[8] Jacobus also tries to argue that Plaintiffs' April 2021 disclosure was a bad faith last minute attempt to deceive the Patent Office. This argument similarly has no merit because the record indicates that '128 patent was issued in July 2021, three months after the allegedly material information was disclosed. Thus, the Examiner had sufficient time to examine the application before issuance.

¶ 121 (assuming that Plaintiffs "would have been aware" of the materiality of the prior art).) Jacobus alleges that the named inventors, patent attorneys at Sterne Kessler, and/or other of Plaintiffs' employees acted with intent to deceive the Patent Office. (*Id.* ¶ 59.) But such group pleading, without any more specific facts, is insufficient for the Court to infer intent to deceive by any specific individual. *See Webasto Thermo & Comfort N. Am., Inc. v. Bestop, Inc.*, 326 F. Supp. 3d 521, 530 (E.D. Mich. 2018) ("Far from singling out the individual with specific intent, [generic pleading] allegations indiscriminately accuse and/or absolve them all."). Jacobus's pleading, thus, falls far short of specifically alleging that any specific individual acted with an intent to deceive. Furthermore, even if the Court agrees that Jacobus specifically identified individuals responsible for the alleged misconduct,[9] Jacobus's claims stop short of adequately pleading "how" the parties engaged in deliberate misconduct or omission. *Exergen*, 575 F.3d at 1328-30.

To be sure, Jacobus also asserts that because Catalyst and SERB knew of the thirteen references and their materiality to the claims being prosecuted, the withholding of these references evidences an intent to deceive. (Countercl. Compl. ¶ 126.) But a district court "must weigh the evidence of intent to deceive independent of its analysis of materiality." *Mycone Dental Supply Co. v. Creative Nail Design, Inc.*, No. 11-4380, 2013 WL 3216145, at *8 (D.N.J. June 24, 2013) (citing *Therasene*, 649 F.3d at 1290). The Court thus concludes that Jacobus has not plausibly alleged facts to support a finding of intent to deceive.

### 2. Defendant's Argument that Plaintiffs Deliberately Misrepresented *McEvoy* Does Not Support a Plausible Allegation of Inequitable Conduct.

Jacobus also argues that statements made by Plaintiffs' counsel to the Patent Office with respect to a prior art reference, *McEvoy*, were false and misleading. A misrepresentation of

---

[9] Jacobus identified "Martin R. Garovoy, Peter E. Haroldsen, and Donald G. Musson" as the named inventors, and identified "Michael J. Keller, Scott A. Schaller, PhD, Matthew S. Bodenstein, and others" as the attorneys responsible for the alleged misconduct. (Countercl. Compl. ¶ 58.)

material fact may give rise to a claim for inequitable conduct, however, an applicant's legal or interpretive arguments in favor of patentability are not actionable. *See Rothman v. Target Corp.*, 556 F.3d 1310, 1328-29 (Fed. Cir. 2009) (reasoning that an effort to persuade without misstating material facts is not an abuse of the patent process). Moreover, it is settled law that attorney argument about a reference the Patent Office *actually considered* cannot give rise to a claim of inequitable conduct. *See Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("When a reference was before the [E]xaminer, whether through the [E]xaminer's search or the applicant's disclosure, it cannot be deemed to have been withheld from the [E]xaminer."). Moreover, an applicant's legal or interpretive arguments favoring patentability are not misrepresentations if such arguments do not contain "gross mischaracterizations or unreasonable interpretations" and are not "demonstrably false." *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007).

Here, Plaintiffs' attorneys' alleged misrepresentations constitute legitimate attorney arguments before the Examiner and, thus, cannot support a claim of inequitable conduct. Plaintiffs' attorneys made arguments concerning references before the Examiner to distinguish *McEvoy* because it "fails to teach administering a dose of about 2.5 mg to about 30 mg of 3,4-DAP." (Pls.' Moving Br. 19.) This characterization is simply the attorneys' arguments, not affirmative misrepresentation. *See Young*, 492 F.3d at 1336 ("We therefore fail to see how the statements . . . which consist of attorney argument and an interpretation of what the prior art discloses, constitute affirmative misrepresentations of material fact.").

### 3. Plaintiffs Did Not Withhold Material Non-Prior Art Information with a Specific Intent to Deceive.

Jacobus argues that Plaintiffs also engaged in inequitable conduct because they withheld material non-prior art information from the Patent Office. In support, Jacobus refers to the non-disclosure of the actual LMS-002 clinical efficacy or safety results and BioMarin's European

12

amifampridine product, ZENAS, and the ZENAS assessment report in its argument. (Countercl. Compl. ¶¶ 94-112.) According to Jacobus, had the Examiner possessed actual clinical efficacy results, the Examiner would have known that the claimed dose ranges have no meaningful connection to safe and efficient treatment of slow acetylator LEMS patients. (*Id.*)

With respect to ZENAS, Jacobus vaguely asserts that BioMarin and SERB attorneys "would have communicated" highly material information with Catalyst employees (*see e.g., id.* ¶¶ 117-18 ("[A]ttorneys or other individuals employed at BioMarin and SERB 'would have communicated' [with Catalyst's attorneys] regarding prosecution of the ['893 patent].")), and that Plaintiffs' counsel "knew or should have known" about the falsity of their statements to the Examiner (*id.* ¶ 130). Jacobus argues that Catalyst, like SERB and BioMarin, was not only aware of the European counterpart that it failed to disclose to the Patent Office, but it also relied on the ZENAS assessment report in its FDA clinical efficacy results. (*Id.* at ¶¶ 94-112.) Plaintiffs counter that Jacobus has again failed to plausibly allege materiality or specific intent to deceive. (Pls.' Moving Br. 23-27.) Plaintiffs also argue that the non-prior art information was not material to the written description requirement. (*Id.*) The Court agrees.

First, the Court finds that Jacobus's argument that the claimed dosages had no meaningful connection to efficient treatment of slow acetylator patients is a written description challenge under 35 U.S.C. § 112, distinct from the inequitable conduct claim. Thus, the meaningful connection argument fails to state a claim of inequitable conduct, and the Court refuses to resolve the written description issue at this stage of the litigation. Second, Jacobus's argument that since BioMarin knew of ZENAS, its knowledge should somehow be imputed to Plaintiffs is equally unavailing. In its argument, Jacobus stops short of setting forth in detail the specific intent of the alleged tortfeasors. (*See, e.g.,* Countercl. Compl. ¶ 112 (speculating that "Catalyst, like SERB and BioMarin, was aware of and highly familiar with the European ZENAS and FIRDAPSE

13

products").) Jacobus fails to plausibly allege if, when, and how BioMarin communicated material information with Plaintiffs and formulated an intent to deceive the Patent Office. *Exergen*, 575 F.3d at 1328-29. Furthermore, the Federal Circuit has long abandoned the "should have known" standard in context of inequitable conduct inquiries. *Therasense*, 649 F.3d at 1290 ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a "should have known" standard does not satisfy [the specific] intent requirement.") (quoting *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 n.11 (Fed. Cir. 1988)).

Therefore, in the absence of any facts evidencing Plaintiffs' deliberate decision to withhold a known material reference to defraud the Patent Office, the Court finds that Jacobus failed to adequately plead inequitable conduct here.

### B.  Motion to Strike

Plaintiffs have moved to strike Defendant's inequitable conduct defense. As Jacobus has failed to plausibly allege its inequitable conduct counterclaim, the Court concludes that, under Federal Circuit law, Jacobus's affirmative defense of inequitable conduct is insufficient as a matter of law. *Eagle View Techs.*, 325 F.R.D. at 102 (finding that the affirmative defense is tied to the inequitable conduct counterclaim); *Depomed, Inc. v. Purdue Pharma L.P.*, No. 13-571, 2017 WL 2804953, at *9 (D.N.J. June 28, 2017) (linking inequitable conduct theories to the pertinent affirmative defenses). The Court, therefore, grants Plaintiffs' Motion to Strike Jacobus's inequitable conduct defense.

## IV. CONCLUSION

For the reasons set forth above, Court grants the Plaintiffs' Motion to Dismiss Jacobus's Inequitable Conduct counterclaims without prejudice. The Court also grants Plaintiffs' Motion to Strike the inequitable conduct defenses. The Court will enter an order consistent with this Memorandum Opinion.

_____
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE